[Crim. No. 6677. Fifth Dist. Jan. 24, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
LARRY CURTIS ALEXANDER, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

\*Parts III, IV, V, VI, VII, VIII, IX and X of this opinion are not published, because they do not meet the standards for publication contained in California Rules of Court, rule 976(b).

**COUNSEL**

Frank O. Bell, Jr., State Public Defender, under appointment by the Court of Appeal, Mark L. Christiansen, Chief Assistant State Public Defender, and Lisa Short, Deputy State Public Defender, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Roger E. Venturi and Anthony L. Dicce, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**BROWN (G. A.), P. J.**—Larry Curtis Alexander appeals from a judgment

upon a jury verdict finding him guilty of murder with special circumstances (Pen. Code, §§ 187, 190.2, subd. (a)(17)(i)) and robbery (Pen. Code, § 211). The jury also found that he used a gun (Pen. Code, § 12022.5). He was sentenced to life imprisonment without possibility of parole on the murder count and to the upper term of five years on the robbery count, which was enhanced by two years for the gun use. The two latter sentences were stayed pursuant to Penal Code section 654.

Appellant raises many issues on appeal which we will consider seriatim after summarizing the facts.

### FACTS

Sharon Mack met Larry Alexander, appellant, in mid-June 1981. A week or two later, appellant asked Ms. Mack to move in with him. About a month later, the victim, Larry Tyler (Tyler), moved in with appellant and Ms. Mack. Shortly before Tyler moved in, appellant asked Ms. Mack to come to the window of his apartment and look at Tyler's 1973 Dodge Challenger automobile; appellant stated that he wanted the car and that he "would do anything to get it." After Tyler moved in, appellant and Ms. Mack discussed a plan to get the car. Appellant told Ms. Mack that the three of them, Ms. Mack, Tyler and appellant, would go to an abandoned farmhouse where appellant used to live on the pretense that they were going to rent it and fix it up. Once there, appellant would shoot Tyler and bury him with Ms. Mack's help. Appellant and Ms. Mack discussed this plan a few times.

Thereafter, appellant and Ms. Mack went to appellant's mother's house to obtain a shovel and dropped it off by the side of the abandoned farmhouse where Tyler was eventually killed.

In August 1981, appellant told Tyler of the farmhouse where the three of them could live. Appellant also told Tyler that he was going to get a gun because there were a lot of bums in the area.

On Saturday, August 29, 1981, in the presence of Ms. Mack and Tyler, appellant purchased a .22 caliber single shot rifle from the Globe Loan and Jewelry Company in Bakersfield. Ms. Mack testified that before they went to buy the gun, appellant told her that he was looking for a quiet gun that would not make a loud noise when it shot off.

Appellant, along with Ms. Mack and Tyler, returned to appellant's apartment where appellant attempted, unsuccessfully, to fire the gun. When the three arrived at the pawn shop in order to return the gun, appellant was arrested on a misdemeanor warrant.

Ms. Mack tried to return the gun herself but was told she would have to wait until appellant was released from jail.

Around 7 or 8 p.m. that same day, after his mother bailed him out of jail, appellant returned to his apartment. He retrieved the gun from the trunk of Tyler's car and fashioned a firing pin by sawing a piece of steel and fit it inside the weapon so it would fire.

After appellant repaired the rifle, Tyler drove appellant and Ms. Mack to the abandoned farmhouse. The farmhouse belonged to Gene Lundquist and was located on Sunset Boulevard in the Lamont area of Kern County. They arrived around 10 or 11 p.m. and parked behind the farmhouse. All three got out of the car. Ms. Mack and appellant began to show Tyler the farmhouse. Appellant carried the gun, and they had a flashlight. Appellant then told Ms. Mack to go outside and smoke a cigarette. She went to the car and observed the two men walk outside the house to a garage and enter a wooden barn. Ms. Mack testified that she saw the light of the flashlight flashing upon the roof of the barn, heard some pushes and heard Tyler say "This isn't getting funny anymore." A gun went off and appellant came running out of the shed and told Mack "I shot him" "but the funny thing about it, was when I shot him the bullet went up in the back of his ear and he didn't bleed, didn't do anything."

Appellant and Ms. Mack then retrieved the shovel they had taken from appellant's parents' house. Appellant dug a grave in the field by the house, put the body inside the grave and filled the grave with dirt. Appellant then threw the shovel in the field.

When Ms. Mack and appellant returned to the Challenger, appellant handed Tyler's wallet to Ms. Mack. She rifled through it, keeping the money and inspecting its other contents. She gave the pink slip, or car registration paper, to appellant; according to Ms. Mack, it was not signed. The wallet was left in the car.

The next morning, appellant and Ms. Mack took the Challenger to appellant's mother's home, where appellant told his family that he had bought the car from Larry Tyler. The following Monday, August 31, after he removed the hand-fashioned steel firing pin, appellant and Ms. Mack returned the gun to the pawn shop and appellant got his money back.

Ms. Mack and appellant moved out of appellant's apartment a week or so later and lived out of the Challenger for a period of time.

Appellant asked Ms. Mack to practice Larry Tyler's handwriting so that she could sign Tyler's name on the pink slip as proof of ownership should

appellant ever be put in jail. As a handwriting sample, she testified she used the pink slip and food stamp cards, but she stated that she never actually signed the pink slip.

Around September 10, 1981, Ms. Mack was admitted to the hospital for two weeks because her insulin level was lowered and she was dehydrated. She testified that she had experienced problems with diabetes off and on for a long time. After her release, she and appellant moved into a motel on Union Avenue for four weeks.

About a month after the murder, after placing an advertisement in the newspaper, appellant sold the Challenger to Michael Bonilla. Appellant gave Bonilla the car's pink slip, which had Larry Tyler's name on the signature portion.

On September 19, 1981, Kern County Deputy Sheriff William Watkins noticed a Dodge Challenger parked at the abandoned farmhouse on Sunset Boulevard. As he looked around the property, he approached the residence and heard a noise from within. He opened the front door and saw appellant. Appellant's first response was to say to the officer, "I guess you caught me." Then appellant told the officer he had permission to be at the house but could not remember the name of the person who granted him such permission. Kern County Deputy Sheriff Phillip Crosby had heard Deputy Watkins' radio call and also went to the Sunset Boulevard farmhouse. Appellant was arrested for trespassing and consented to a search of the Dodge Challenger. The search uncovered Larry Tyler's wallet under the driver's seat. The wallet contained papers bearing Larry Tyler's name. Appellant informed Deputy Crosby that he had bought the car from Tyler, his ex-roommate, who had since returned to Florida. Crosby ran a check on the Challenger, discovered it belonged to Tyler, and impounded it. The car was later released to appellant upon proof of ownership.

In October 1981, Ms. Mack left appellant and moved into the Bakersfield Hotel. She saw appellant occasionally, but they began to fight. Appellant wanted Ms. Mack to move back in with him, but her feelings had changed about him. Soon thereafter she broke up with him.

Toward the end of Ms. Mack's stay at the Bakersfield Hotel, she saw a poster about the disappearance of Larry Tyler. The poster offered a reward for some information concerning his whereabouts. That evening, she and appellant discussed the poster. Appellant told her that if a sheriff or detective asked her about the whereabouts of Larry Tyler she was to say she did not know anything. Ms. Mack testified that in response to her questioning

appellant what he would do if she told someone about what happened, he said, "You would be a fool, because you would go underground too."

Shortly thereafter, Ms. Mack told her mother, Crystal Mack, about the shooting. She also told her father and her father threatened to tell the police if she did not, so she agreed to talk and asked her mother to contact the authorities.

On November 25, 1981, Ms. Mack recounted the details of the murder to officials from the Kern County Sheriff's and District Attorney's offices. During this initial interview, Ms. Mack told Sheriff's Detective Dwight Pendleton that she had witnessed a homicide committed by appellant. She then accompanied Detective Pendleton and Sergeant Joe Orman to the abandoned farmhouse near Lamont where she said the body was buried three to four feet deep in an adjacent plowed field.

Sergeant Orman searched and found the body. It had been buried three and a half feet deep, approximately ten feet from the place Sharon Mack originally indicated. It was decomposed and was wrapped in a black plastic bag, carpet and burlap material. The body was identified as James M. Land, also known as Larry Tyler. The autopsy disclosed that the cause of death was a gunshot wound to the head and neck which entered through the mouth. The authorities were unable to determine the time of death.

The prosecution presented the testimony of seven other witnesses concerning the events involving Ms. Mack, Larry Tyler, and appellant between August and November 1981. This testimony tended to corroborate Ms. Mack's story.

Steve Magnus, owner of the Globe Loan and Jewelry Company on 19th Street, testified that on the morning of Saturday, August 29, 1981, Larry Alexander, accompanied by a man and a woman (identified by Mr. Magnus as Sharon Mack), purchased a .22 caliber single shot rifle from him for $35. That afternoon, Magnus received a telephone call from appellant informing him that the rifle did not work. Subsequently, Ms. Mack returned to the store and told Magnus that appellant was being arrested in front of the store and could not return the rifle himself. Magnus indicated to her that appellant could return the rifle on the following Monday or Tuesday.

On Monday, August 31, 1981, appellant returned the rifle and informed Magnus that it did not fire. Magnus could not fix the malfunction and gave appellant his money back. The rifle appeared to Magnus to be in the same condition as it had been when he sold it. Magnus did not recall smelling any gunpowder on the rifle.

Terrence Pasco, an examiner of questioned documents, testified for the prosecution as to whether the signature of Larry J. Tyler on the Dodge Challenger pink slip was forged. Mr. Pasco formed two opinions on the issue, one before he was contacted by the district attorney's office and one thereafter. Based on several documents, Pasco originally concluded in a written report that (1) there was a strong possibility that Tyler actually signed the pink slip, (2) he was not able to detect any attempt to simulate or trace Tyler's signature on the pink slip, and (3) he was not able to associate any of appellant's writings with Tyler's signature on the pink slip.

Eight months later, Pasco was contacted by a deputy district attorney and asked to consider additional features of the document he originally analyzed. After Pasco obtained additional handwriting samples of Tyler and appellant, his opinion changed from a strong probability that Tyler signed the pink slip to a probability that it was not authored by Tyler.

In mid-October 1981 Chris Vanberg, a farmer, was picking cotton with his assistant in a field when his assistant ran over a shovel with a John Deere picker, breaking the handle.

Crystal Mack testified over a running defense hearsay objection that just before Thanksgiving, 1981, her daughter, Sharon Mack, told her that she was involved in the killing of Larry Tyler. Crystal Mack effectively reiterated to the jury the story Sharon Mack had told regarding Tyler's death.

Crystal Mack further testified that Sharon Mack had suffered from diabetes since the age of six; that she started having emotional problems at the age of fifteen; that she was a slow learner in school; that she had been hospitalized on numerous occasions; and that several years earlier she tried to kill herself.

Greg Laskowski, a sheriff's department criminalist, testified that he examined the .22 caliber rifle recovered from the Globe Loan and Jewelry Company. The rifle did not fire, so he removed the bolt mechanism, constructed a firing pin using a saw and a ruler, and test fired it. He attempted a ballistics comparison between the rifle and the lead fragments recovered from the body but was unsuccessful. He testified that the fragments were similar to the .22 caliber bullets, but he could not positively connect the fragments to the rifle.

On cross-examination, Ms. Mack testified that she was presently on medication consisting of insulin and Dilantin for epilepsy. She denied that she once tried to kill herself with phenobarbital after having a fight with a former boyfriend, and stated that the only time she tried to commit suicide

was when she was at home. She testified that she had taken overdoses of Dilantin three times because of her parents' fighting and that she once tried to kill herself by cutting herself with a razor blade as the result of family difficulties.

Ms. Mack testified that she did not have organic brain damage that she knew of; that she did not know what schizophrenia was and had not, to her knowledge, been diagnosed as schizophrenic. She admitted having been in and out of the Kern Medical Center on a regular basis since 1976, a couple of times because of attempted suicide. She was also in the mental ward two or three times, at least once because she was on the edge of a nervous breakdown. She could not remember whether she ever had blackout spells. Ms. Mack testified that appellant told her that he was going to buy a gun to protect himself from all the thievery in the area.

The defense's case basically consisted of impeaching Ms. Mack's testimony. In addition, several witnesses were called to testify. The only testimony relevant for our purposes was that of Mr. Vernon Coleman.

Vernon Coleman used to live next door to Mr. Alexander on 17th Street in Bakersfield and in front of the apartment where Ms. Mack was living when she met appellant. Mr. Coleman testified that he saw Tyler a couple days after August 29, 1981, and that Tyler said that he was going to the blood bank. He later saw the Challenger parked near the blood bank and observed Tyler at a hot dog stand on 19th Street. Mr. Coleman also testified that he recalled a discussion about appellant buying the car from Tyler who was not working and needed money.

## DISCUSSION

### Part I

### Representative Jury

Appellant contends he was denied his federal and state constitutional right to an impartial jury drawn from a fair cross-section of the community (*Taylor* v. *Louisiana* (1975) 419 U.S. 522 [42 L.Ed.2d 690, 95 S.Ct. 692]; *People* v. *Wheeler* (1978) 22 Cal.3d 258, 271-273 [148 Cal.Rptr. 890, 593 P.2d 748]) in that his jury was selected from a panel containing a disproportionately small number of blacks and Spanish surnamed individuals than would be predicted as a result of random selection.

In *Duren* v. *Missouri* (1979) 439 U.S. 357, 364 [58 L.Ed.2d 579, 586-587, 99 S.Ct. 664], the United States Supreme Court set forth the prin-

ciple that: "In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process."

In the case at bench it is not disputed that blacks and Hispanics are a distinctive group. While there is no evidence in this case that any disparate representation was intended or purposeful, it is now settled that the "systematic exclusion of the group in the jury-selection process" requirement is satisfied if the disparity is "inherent in the particular jury-selection process utilized." (*People* v. *Harris* (1984) 36 Cal.3d 36, 58 [201 Cal.Rptr. 782, 679 P.2d 433], cert. den., *California* v. *Harris* (1984) — U.S. — [83 L.Ed.2d 301, 105 S.Ct. 365].) "All that need be shown is that the system of selection results in denial of a jury pool representing a fair cross-section of the community." (*Id.*, at p. 58.)

The challenge in this case is directed to the second requirement of *Duren*, that the representation of Hispanics and blacks is not fair and reasonable in relation to the number of such persons in the community; that the disparity that exists between the number of blacks and Hispanics in the general population and the number who appear in court as members of the jury venire shows significantly fewer blacks and Spanish surnamed individuals in the jury venire than would be expected as a result of random selection; and that this underrepresentation is due to the practices and methods employed by the jury commissioner's office in excusing veniremen for hardship.[1] (See *People* v. *Buford* (1982) 132 Cal.App.3d 288, 297-298 [182 Cal.Rptr. 904].) The record suggests that Kern County follows no written standards in excusing jurors, and does not always require written requests before jurors are excused. Jurors are often excused by telephone by the commissioner and members of her staff.

Appellant makes no contention that the initial selection of the jury pool from both the voter registration lists and lists of licensed drivers and persons holding identification cards supplied by the Department of Motor Vehicles was flawed or that there were discriminatory peremptory challenges to Spanish and blacks at the voir dire. (See *People* v. *Wheeler, supra,* 22 Cal.3d 258.)

---

[1] Code of Civil Procedure section 200 provides: "The court shall excuse a person from jury service upon finding that the jury service would entail undue hardship on the person or the public served by the person."

In the instant case appellant presented evidence that according to the 1980 census figures the general population of Kern County is 5 percent black and 18 percent Spanish surnamed. The evidence presented also showed that the jury venire during August 1982 consisted of 11.8 percent Spanish surnamed individuals, resulting in an absolute disparity of 6.2 percent between the general Spanish surnamed population and the Spanish surnamed individuals appearing in the jury venire at the time of trial. As to blacks, there was some evidence that they constituted 3.2 percent of the venire, resulting in an absolute disparity of 1.8 percent.

Appellant's expert testified that the chance of these kinds of disparities occurring on a random basis is only one in ten million for blacks and only one in one million for Spanish surnamed individuals, concluding there must be something causing the disparity other than chance.

In *People* v. *Buford, supra,* 132 Cal.App.3d 288, the disparity in Contra Costa County between the blacks in the general population and those appearing on the jury venire was 3.6. From that evidence the court concluded: "The probability of blacks being so underrepresented on Contra Costa County jury panels as a result of mere chance is so small as to warrant the inference, in the absence of explanation, that the disparity results from systematic exclusion (see Kairys, [*Jury Representativeness: A Mandate for Multiple Source Lists*], *supra,* 65 Cal.L.Rev. at pp. 792, 796, fn. 112)." (*Id.,* at p. 297.)

■ Appellant's initial burden is to show a significant underrepresentation of a cognizable group. This burden is met by comparing the county's total population of a cognizable group to the number of the members of that group appearing on the jury venire. If the group is significantly underrepresented on the jury venire, the burden shifts to the People to rebut the prima facie case: "The state may be able to do so by showing through use of figures defining those presumptively eligible for jury service that no disparity of constitutional significance exists, or that even with the use of multiple sources and all other practical means, a certain level of disparity is unavoidable. Finally, it may be able to justify the underrepresentation by showing 'that a significant state interest [is] manifestly and primarily advanced by those aspects of the jury selection process . . . that result in the disproportionate exclusion.' (*Duren* v. *Missouri, supra,* 439 U.S. at pp. 367-368 [58 L.Ed.2d at p. 589].)" (*People* v. *Harris, supra,* 36 Cal.3d at p. 59.)

It is important to note that in *Buford* the court did not hold the existing procedures being reviewed invalid but recognized the appropriate remedy

would normally be to remand for the purpose of permitting the People to make a showing in rebuttal of the prima facie case.[2]

"We emphasize that we do not hold existing jury procedures in Contra Costa County to be invalid. It may be that the disparities demonstrated by appellant's statistical showing can be adequately explained on the basis of other, permissible, factors, or that certain of the procedures can be justified by considerations of practical necessity or other countervailing policies. We do not undertake to decide whether or to what extent the federal or state Constitutions may require a state or county to expend funds in order to eliminate or modify what may be pragmatic obstacles to minority representation on juries, such as the level of jury pay or the costs of transportation. (See Van Dyke, Jury Selection Procedures (1977) ch. 5, pp. 119-121; Kuhn, *Jury Discrimination: The Next Phase* (1968) 41 So.Cal.L.Rev. 235, 323.) And we certainly do not suggest that a county should engage in race conscious selection procedures in order to assure representative juries. We hold only that upon a showing such as made by appellant in this case, the prosecution should have been required to come forward with available evidence of explanation and justification, so as to enable the court to determine whether the county is doing all that can reasonably be expected to achieve the constitutional goal mandated in *Wheeler*." (*People* v. *Buford, supra,* 132 Cal.App.3d at p. 299; fn. omitted.)

In *Buford,* the court recognized that the statistics relied upon "do not identify precisely 'when in the selection process the systematic exclusion took place.' (*Duren* v. *Missouri, supra,* 439 U.S. at p. 366 [58 L.Ed.2d at p. 588].)" (*id.,* at p. 298), but nevertheless proceeded to focus upon the informal practice in Contra Costa County of excusing jurors from service, such as those excused for job obligations and qualifications, economic hardship, inadequate jury fees, and family obligations, without establishing fixed standards or the requirement for written applications to be excused. In *Buford,* it appears about 30 percent of the jurors were excused without written applications, by a telephone call to the jury commissioner or personnel in his office, without judicial intervention, and without any fixed written standards. While the court does not articulate the reason why this practice may account for a disproportionate number of minorities being excused, it would appear that this conclusion could only be based upon the speculative assumption that because of the generally lower economic status of some minorities and/or cultural and social differences, more of the members of those groups ask to be excused from jury duty than nonminorities. No statistical information or study or expert opinion is offered or cited to substantiate this

---

[2]Because the appellant in *Buford* had already served his sentence, the court recognized that the appropriate remedy there, from a practical standpoint, was to reverse.

supposition. The court suggests reforms, such as requiring the county to adopt uniform standards for excusing jurors for hardship and requiring that all requests be in writing. There is no statistical evidence that such reforms would substantially change the disparity.

The fact is, without more factual information, accurate conclusions regarding the cause of the disparity cannot be drawn and any attribution of the cause is wholly speculative. At a minimum, it should be known what the absolute disparity is between minorities in the general population and the number who appear on the jury venire. To the extent that the absolute disparity may be due to economic, cultural, social or language considerations, the difference must be deemed to be "unavoidable." (See *People* v. *Harris, supra,* 36 Cal.3d at p. 59.)

The process of jury selection is a continuum, involving many steps from the initial selection of the jury pool to the final impanelment of the jury. Along the way there are many opportunities for factors to operate to cause underrepresentation of minorities in the jury venire. The precise extent to which each of the factors operates is unknown. It does appear, however, that some of the factors, at least, are beyond the control of the judiciary and therefore unavoidable.

A few examples are appropriate: The 1982 federal census, of which we take judicial notice (Evid. Code, § 452, subds. (b), (c), (h)), shows that the portion of minorities eligible to vote, but failing to register, is much larger than comparable figures for the general population. For the general population, the national census shows that in 1974 37.8 percent of those eligible to vote did not register. In 1978 the figure was 37.4 percent, and in 1982 35.9 percent. For minorities, the figures are significantly lower. Thus, of blacks eligible to vote, 45.1 percent did not register in 1974, 42.9 percent in 1978, and 40.9 percent in 1982. ■■ ■■■■ ■■ For those of Spanish origin, the statistics were 65.1 percent in 1974, 67.1 percent in 1976, and 64.7 percent in 1982. (U.S. Bureau of the Census, *Statistical Abstract of the United States: 1984* (104th ed.) Washington, D.C. 1983.)[3]

Obviously, to the extent that the voters' lists are the source of the jury venire, these statistics demonstrate that a random selection of jurors from those lists would result in a large underrepresentation of minority jurors and

---

[3]The court duly served on the parties notice of intention to take judicial notice of these census figures and of the statistical information appearing in the California Department of Justice's documents referred to in footnote 4, *post.* Appellant filed an objection, which we deny. Judicial notice is proper. (Evid. Code, § 452, subds. (b), (c) and (h); *People* v. *Harris, supra,* 36 Cal.3d at p. 48, fn. 3.)

may account for a very large part of the statistical results presented by appellant in this case. This fact is beyond the control of the judiciary.

Next, the gross minority census figures utilized by appellant include citizens and noncitizens (resident aliens), persons under 18 years of age, persons who are non-English-speaking, and persons convicted of felonies. On the other hand, juror qualifications require a person to be a citizen, 18 years of age, English-speaking (Code Civ. Proc., § 198), and not be an ex-felon (Code Civ. Proc., § 199). Thus, the general census figures include many persons who are not voter eligible. Moreover, as observed by a law review article, "eligible population figures are almost impossible to obtain." (Kairys, *Jury Representativeness: A Mandate for Multiple Source Lists* (1977) 65 Cal.L.Rev. 776, 785-786, fn. 63.) Further, the Federal Bureau of the Census has acknowledged the problem of determining the citizenship status of Hispanics. "'A reliable estimate of the number of undocumented aliens residing in the United States is not available and is unlikely for the immediate future.' (Rep. to Cong. by Comptroller General, Number of Undocumented Aliens Residing in the United States Unknown, GGD-81-56 (Apr. 6, 1981) pp. 3-4.)" (*People* v. *Harris, supra,* 36 Cal.3d at pp. 53-54; fn. omitted.)

Thus, any study of the jury venire using for comparison the entire population of minorities, rather than those eligible to vote, skews the basic statistics toward showing a larger absolute disparity by an amount unknown. Common experience dictates that the percentage of minorities appearing in the general census figures who are statutorily ineligible for jury service must be large.[4] Yet those ineligible are included in the gross population figures utilized in the statistics presented by appellant.

Finally, we note the venire in the instant case was drawn from a jury pool of citizens which included not only voter registration lists but those names which appear on lists of licensed drivers and identification card holders supplied by the Department of Motor Vehicles. (Code Civ. Proc., § 204.7.) While this undoubtedly broadens the base of juries selected, it is far from clear that the use of the Department of Motor Vehicles lists will do much to correct the disparity which may be due to the long-standing cultural,

---

[4]For example, statistics from the California Department of Justice, Bureau of Criminal Statistics and Special Services, shows that of the adult felony arrestees receiving felony sentences in 1983 in Kern County, 48 percent were white, not Hispanic, 28 percent were Hispanic, and 22 percent were black. Thus, while the general population in Kern County is approximately 18 percent Hispanic, that group suffered 28 percent of the felony sentences. As to blacks, the general population figure is 5 percent, yet blacks accounted for 22 percent of the felony sentences. (Cal. Dept. of Justice, Bureau of Crim. Statistics and Special Services, Table 2, Adult Felony Arrestees Receiving Felony Sentences, 1983, Kern County.)

economic, social and language differences. As Justice Mosk observed in his dissent in *Harris*: "There is even a $6 charge for one to obtain an identification card issued by the Department of Motor Vehicles pursuant to Vehicle Code section 13000 et seq., and $10 for a driver's license pursuant to Vehicle Code section 12800 et seq. . . . [T]he lists do not represent a cross-section of the community, but only those persons with the initiative, motive and financial ability to apply for the licenses or identification cards, an effort considerably more complicated and costly than registering to vote. No statistics have been offered to indicate minorities are better represented on such lists than on voter registration lists, and there is good reason to believe they are not." (*People* v. *Harris, supra,* 36 Cal.3d at p. 74.)

This discussion is intended only to point out the magnitude of the problem of assuring compliance with the fair cross-section requirement and to serve as a word of caution against too readily attributing any statistical disparity to causes over which the judiciary has control. ▋ In reality, it may well be that the amount of the absolute disparity attributed to the procedure of informally excusing jurors is infinitesimal and inconsequential when compared to the other major causes of such disparity. Only further proof and factual information will clarify the significance of the practices utilized in excusing jurors. At this point, attributing the statistical disparity entirely to the practice of orally excusing jurors for undue hardship without written standards would not appear to be justified. Nor should an assumption of such speculative causation serve as a basis for reversal of a criminal conviction.

We do not suggest by these comments, however, that the trial courts should not do what they can to assist in alleviating the problem. Courts can and should promptly undertake to comply with all statutory and rule requirements in the area of excusal from jury service.[5]

In the case before us, practically no rebuttal evidence was presented by the People, and it is not entirely clear that more cannot be presented. At the time this cause was tried, and before *People* v. *Harris, supra,* 36 Cal.3d

---

[5]This would include complying with section 4.5 of the Standards of Judicial Administration, dealing with the granting of excuses from jury service. Note that this section is being completely revised and amended effective January 1, 1985. It would also include compliance with Code of Civil Procedure section 204.3, subdivision (b), requiring the jury commissioner to summon any person who has failed to complete a questionnaire to appear before him to fill out a questionnaire. The commissioner should also comply with sections 225 and 238 of the Code of Civil Procedure. Section 225 requires a person failing to respond to a summons to be "immediately resummoned," and section 238 provides that "Any trial juror summoned, who willfully and without reasonable excuse fails to attend, may be attached and compelled to attend; and the court may also impose a fine not exceeding fifty dollars ($50) [now $250], upon which execution may issue." The commissioner may also ask the court to exercise its contempt power.

36, was filed on April 20, 1984, the majority of California cases had held the use of voter registration lists as the sole basis of jury selection was valid and that statistical disparities based upon gross population statistics rather than voter eligibility statistics could not form a basis for challenge to such lists. (See *People* v. *Lewis* (1977) 74 Cal.App.3d 633, 646 [141 Cal.Rptr. 614]; *People* v. *Mooring* (1982) 129 Cal.App.3d 453, 459 [181 Cal.Rptr. 71]; *People* v. *Spears* (1975) 48 Cal.App.3d 397, 404 [122 Cal.Rptr. 93]; *People* v. *Powell* (1974) 40 Cal.App.3d 107, 128-129 [115 Cal.Rptr. 109], cert. den., *Smith* v. *California* (1975) 420 U.S. 994 [43 L.Ed.2d 677, 95 S.Ct. 1435].)

The People apparently relied upon this pre-*Harris* rule and presented no rebuttal evidence. ██ The People should now have an opportunity to do so, and the trial court should rule upon this issue in light of such evidence and comments and guidelines herein.[6]

*Part II*

*Carlos Error*

In *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131, 142 [197 Cal.Rptr. 79, 672 P.2d 862], the Supreme Court held that proof of intent to kill or aid in a killing is essential to a finding of a felony-murder special circumstance under Penal Code section 190.2, subdivision (a)(17). ██ Appellant correctly argues that while the prosecution pursued the murder conviction on both the theory of deliberate and intentional premeditated murder and upon the theory of felony (robbery) murder, the jury instructions[7] permitted the jury to find the special circumstance of felony murder without proof of intent to kill. The instruction had the effect of removing the issue of intent from the jury. The instruction was thus error.

---

[6]Penal Code section 1260 provides: "The court may reverse, affirm, or modify a judgment or order appealed from, or reduce the degree of the offense or attempted offense or the punishment imposed, and may set aside, affirm, or modify any or all of the proceedings subsequent to, or dependent upon, such judgment or order, and may, if proper, order a new trial and may, if proper, remand the cause to the trial court for such further proceedings as may be just under the circumstances."

In *People* v. *Vanbuskirk* (1976) 61 Cal.App.3d 395, 405 [132 Cal.Rptr. 30], the court stated: "[W]hen the validity of a conviction depends solely on an unresolved or improperly resolved factual issue which is distinct from issues submitted to the jury, such an issue can be determined at a separate post-judgment hearing and if at such hearing the issue is resolved in favor of the People, the conviction may stand."

[7]The jury was instructed as follows: "In order to find the defendant guilty of murder in the first degree, it is not necessary that all jurors agree in the determination that there was a deliberate and premeditated design to take the life of the deceased, or in the conclusion that the defendant was at the time engaged in the commission of robbery, or an attempt to commit one; it is sufficient that each juror is convinced beyond a reasonable doubt that the defendant committed the crime of murder in the first degree as that offense is defined."

In *People* v. *Garcia* (1984) 36 Cal.3d 539 [205 Cal.Rptr. 265, 684 P.2d 826], the court held *Carlos* retroactive. Accordingly, *Carlos* governs this case even though the incident, trial and conviction herein occurred prior to the date of *Carlos*.

In *Garcia*, the court held the error reversible per se with very limited and narrow exceptions. The only possible exception on the facts of this case is the so-called *Cantrell-Thornton* exception. That exception encompasses situations when questions and issues are not raised by the evidence (*People* v. *Cantrell* (1973) 8 Cal.3d 672 [105 Cal.Rptr. 792, 504 P.2d 1256]) and when it is clear on the appellate record that as a matter of law defendant's acts constitute the offense (*People* v. *Thornton* (1974) 11 Cal.3d 738 [114 Cal.Rptr. 467, 523 P.2d 267], cert. den., *Thornton* v. *California* (1975) 420 U.S. 924 [43 L.Ed.2d 393, 95 S.Ct. 1118]). Uncertain whether the United States Supreme Court endorsed the *Cantrell-Thornton* exception to the apparent rule favoring automatic reversal, the court noted that: "[F]our justices of the court would be sympathetic to a limited exception that would avoid retrial in some cases in which the evidence unequivocally and conclusively established intent, but leaves it uncertain whether a majority would take that position. Accordingly, pending further guidance from the United States Supreme Court, we will apply the reasoning of *Cantrell* and *Thornton* only to those cases clearly falling within the ambit of that reasoning so as not to detract substantially from the per se character of the high court's rule." (*People* v. *Garcia, supra,* 36 Cal.3d at p. 556.) Therefore, the critical question presented is whether this case clearly falls within the ambit of *Cantrell-Thornton* reasoning.

*Garcia* observed that the *Cantrell-Thornton* analysis should not in all circumstances be applied to *Carlos* error, stating: "In many cases it will be difficult to apply the *Cantrell-Thornton* analysis to *Carlos* error. If the defendant in a pre-*Carlos* trial was unaware that intent to kill was an element of the felony-murder special circumstance, he might through ignorance fail to present evidence worthy of consideration on that matter. We could not in such cases affirm a special circumstance finding on the ground that defendant did not introduce evidence sufficient to raise a material issue. But there may also be cases where the parties recognized that intent to kill was in issue, presented all evidence at their command on that issue, and in which the record not only establishes the necessary intent as a matter of law but shows the contrary evidence not worthy of consideration. In such a case the reasoning of *Cantrell* and *Thornton* may avoid a meaningless retrial." (*People* v. *Garcia, supra,* 36 Cal.3d at p. 556; fn. omitted.)

In the present case, the evidence in the record makes it a very close case as to whether appellant intended to commit murder as a matter of law. There

was little, if any, evidence to contradict a finding of intent to kill. However, this case was tried before *Carlos* and, as alluded to in *Garcia,* appellant was probably unaware that intent to kill was an element of the felony-murder special circumstance, and thus through ignorance might have failed to present defense evidence worthy of consideration. (*People* v. *Garcia, supra,* 36 Cal.3d at p. 557.) Therefore, we cannot affirm the special circumstance finding on the ground that defendant did not introduce evidence sufficient to raise a material issue. On the contrary, we are compelled to reverse the special circumstance finding. Because the evidence is more than sufficient to support a special circumstance finding based upon intent independent of the felony-murder doctrine, the prosecution is free to seek retrial upon this issue. (*People* v. *Garcia, supra,* at p. 557.)

*Part III**

. . . . . . . . . . . . . . . . . . . . . . .

*Disposition*

The finding of a special circumstance under Penal Code section 190.2, subdivision (a)(17), is set aside. The cause is reversed and remanded to the trial court for the limited purpose of promptly conducting a hearing to take further evidence on jury selection practices at the time this cause was tried and at the present time and decide if the County of Kern was and is doing all that it reasonably may be expected to do to assure a trial jury representing a fair cross-section of the county in light of the evidence and comments and guidelines herein; if the court finds the trial jury was, under the circumstances, constitutional, then the judgment convicting defendant of murder and robbery, together with the finding that the defendant personally used a firearm, will be reinstated and affirmed.[11] The court shall modify defendant's sentence accordingly and prepare, file and transmit to the Department of Corrections an amended abstract of judgment reflecting the sentencing changes.

Franson, J., and Hamlin, J., concurred.

A petition for a rehearing was denied February 21, 1985, and the opinion was modified to read as printed above.

---

*See footnote, *ante,* page 1189.

[11]The prosecution may seek a retrial of the special circumstance finding. (See *People* v. *Garcia, supra,* 36 Cal.3d 539, 557.)